UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MISSOURI
EASTERN DIVISION

| | |
|---|---|
| CAROL A. MIDDLETON, )<br>)<br>Plaintiff, )<br>)<br>v. )<br>)<br>MICHAEL J. ASTRUE, )<br>Commissioner of Social Security, )<br>)<br>Defendant. ) | No. 4:10 CV 415 HEA / DDN |

**REPORT AND RECOMMENDATION**
**OF UNITED STATES MAGISTRATE JUDGE**

This action is before the court for judicial review of the final decision of defendant Commissioner of Social Security denying the application of plaintiff Carol A. Middleton for disability insurance benefits and supplemental security income under Title II of the Social Security Act, 42 U.S.C. § 401, et seq., and Title XVI of the Act, 42 U.S.C. § 1381, et seq. The petition was referred to the undersigned United States Magistrate Judge for review and a recommended disposition in accordance with 28 U.S.C. § 636(b). For the reasons set forth below, the undersigned recommends that the ALJ's decision be remanded.

**I.  BACKGROUND**

Plaintiff Carol A. Middleton was born on June 26, 1956. (Tr. 30.) She was 5'8" tall and weighed 135 pounds at the time of the hearing. (Tr. 655, 17.)  She was married to Kimber M. Middleton from 2001 until his death in 2004. (Tr. 74.)  Plaintiff was previously married to George Burke from 1981 until George's death in 1991. (Tr. 74.)  Plaintiff lives with her father part of the time and with her daughter part of the time. (Tr. 684.)  She completed high school and two years of college. (Tr. 684.)  She last worked cleaning houses part-time prior to her July 2007 surgery. (Tr. 686.)

On October 10, 2007, plaintiff applied for a period of disability, for disability insurance benefits, and for supplemental security income. (Tr. 10.)  Plaintiff alleged she was disabled beginning July 11, 2007 due

to perontonitis, a perforated ulcer, and an open stomach wound. (Tr. 137.) The claims were denied on October 31, 2007. (Tr. 10.) After a hearing on June 19, 2009 before an Administrative Law Judge (ALJ), the ALJ denied benefits on July 14, 2009. (Tr. 19.) On January 11, 2010, plaintiff received the Appeals Council's denial of her request for review, making the ALJ's decision the final decision of the Commissioner. (Tr. 3.)

## II. MEDICAL HISTORY

On July 12, 2007, plaintiff went to St. Joseph Health Center with severe abdominal pain. (Tr. 665.) Daniel Bergmann, M.D., suspected plaintiff had an acute surgical abdomen, secondary to perforated duodenal ulcer. (Tr. 666.) He performed an emergency exploratory laparotomy with oversewing of gastric ulcer and Graham patch. (Tr. 663-64.) A subsequent computed tomography (CT) scan showed residual free air and fluid collection while plaintiff was in the intensive care unit (ICU). Films after the surgery showed some continuing abdominal problems. (Tr. 657-58.)

On July 19, 2007, Dr. Bergmann performed a second exploratory laparotomy, this time draining perisplenic and pelvic abscesses and inserting a feeding tube. (Tr. 657-58.) After the procedure, plaintiff returned to the ICU. (Tr. 658.)

On July 27, 2007, Abna Ogle, M.D., of SSM Rehab, evaluated plaintiff's progress. Dr. Ogle noted that plaintiff had suffered progressive respiratory failure after her operations, leading to re-intubation and oxygen-dependancy as of the date of evaluation. (Tr. 491.) She also had undergone mental status changes from metabolic encephalopathy due to alcohol withdrawal. (Id.) Also on this date, plaintiff weighed 127.5 pounds, and her weight was considered "stable." (Tr. 488.)

On August 8, 2007, plaintiff was discharged. (Tr. 623.) On August 10, 2007, a dietician indicated plaintiff would stop using her feeding tube in approximately ten days. (Tr. 605.)

On August 17, 2007, Dr. Bergmann noted a post-operative infection and long-term antibiotic use during a follow-up visit. (Tr. 155.) On

August 17, 2007, October 31, 2007, December 5, 2007, and February 22, 2007, Dr. Bergmann ordered home care to change plaintiff's wound dressing three times per week to assist with healing. (Tr. 267-69; 265-66; 262-63; 259-60.)

On September 14, 2007, Dr. Bergmann noted plaintiff's wound had good granulation. (Tr. 501.) He also started plaintiff on the Wound-EVAC system. (Id.) On September, 25, 2007, her energy level was improving. (Id.) On October 8, 2007, plaintiff's wound was improving. (Tr. 500.)

On October 4, 2007, Robert Fink, R.N., plaintiff's home care nurse, completed a sixty-day summary. (Tr. 164-65.) He noted disruption of an internal operation wound. (Tr. 164.) In that same report, he noted that her wound was eleven centimeters by four centimeters by one-half centimeter with a beefy red base; there were no signs or symptoms of infection. (Tr. 164-65.) Plaintiff was tolerating the wound care well, and could perform light housework, eat, prepare light meals, use the telephone, and handle money with no assistance. (Id.)

On October 15, 2007, plaintiff saw Anne Marie Woodruff, R.N., B.C., F.N.P., and Daniel R. Jasper, M.D., plaintiff's primary care physician. (Tr. 640.) Plaintiff's blood pressure was 230/100. (Id.) She smelled of alcohol and cigarettes. (Id.) Nurse Woodruff and Dr. Jasper encouraged her to stop smoking and drinking. (Id.) Dr. Jasper prescribed Atenol to control her hypertension, as plaintiff had not taken blood pressure medications in the last three months. (Id.)

On November 26, 2007, Dr. Bergmann said plaintiff was doing well and that her wound was slowly healing with the assistance of the Wound EVAC. (Tr. 171.) On December 5, 2007, Robert Fink noted plaintiff's wound was nine centimeters by three centimeters by one-half centimeter with no signs or symptoms of infection. (Tr. 162-63.) Plaintiff did not need any assistance to eat, walk, prepare light meals, use the telephone, or manage her money. (Tr. 162.) She needed some assistance with light housework. (Tr. 162.)

On December 3, 2007, plaintiff still complained of some abdominal pain to Dr. Bergmann. (Tr. 222.) He tried to debride her wound, but plaintiff could not tolerate the procedure. (Id.)

On December 17, 2007, Dr. Bergmann renewed plaintiff's prescription for the Wound EVAC system. (Tr. 167.) He also discussed with plaintiff the possibility of a skin graft. (Tr. 221.) On January 14, 2008, Dr. Bergmann noted a bit more healing, and again offered skin grafting. (Tr. 221.) On February 25, 2008, Dr. Bergmann described the wound as "about healed." (Tr. 220.)

On February 27, 2008, plaintiff was discharged from SSM home care. (Tr. 496.) The final skilled nursing assessment shows that plaintiff was able to walk independently, including up and down stairs with or without railings, dress and bathe herself, prepare light meals, do light housekeeping, and answer and speak on the phone. (Tr. 346-47.) She could drive a car, but needed some assistance when grocery shopping or doing laundry that required lifting and carrying heavier items. (Tr. 347.) She was having intermittent aching pain daily for about a minute at a time, with no recognizable pattern. (Tr. 345.)

On April 11, 2008, Dr. Bergmann noted plaintiff was not eating, losing weight, and vomiting almost daily. (Tr. 219.) On April 14, 2008, plaintiff saw Matthew Nissig, M.D., a gastroenterologist, who described plaintiff as a "poorly nourished anxious female." (Tr. 225.) Plaintiff's wound site was tender, but had good granulation with only a few superficial defects. (Id.) He recommended lab work, a CT scan, and an upper endoscopy to ensure that her gastric ulcer completely healed. (Tr. 226.)

On April 22, 2008, plaintiff underwent a CT scan at St. Joseph Health Center. (Tr. 229.) She had not ingested the contrast solution prior to arriving. (Id.) The scan showed no specific site of abnormal wall thickening; hepatic steatosis and hepatic and splenic calcified granuloma; and diastases of anterior abdominal wall consistent with a history of wound granulation. (Tr. 229-30.)

On April 18, May 14, May 24, and June 27, 2008, Dr. Bergmann's office called in prescriptions for Darvocet to Walgreens' without seeing plaintiff. (Tr. 219.)

On July 5, 2008, plaintiff was admitted to St. Joseph's following a grand mal seizure witnessed by her boyfriend. (Tr. 239.) Jing Min, M.D., noted that plaintiff had a second grand mal seizure in the

emergency room.  (Id.)  At that time, she had a small cut over her left eye from falling and hitting her head on the underside of the bathroom sink two days prior.  (Id.)  Also on July 5, Michael O. Johnston, M.D., noted that plaintiff's head CT showed mild sinusitis.  (Tr. 249.)  Dr. Johnston's impression was that plaintiff had an acute seizure disorder consistent with alcohol withdrawal, mild encephalopathy likely caused by early delirium tremens, hyponatremia, elevated serum transaminases consistent with alcohol hepatitis, and hyperglycemia, with a history of hypertension and a superficial laceration over her eye.  (Id.)

She was sent to the ICU, and on July 6, she denied abdominal pain, nausea, vomiting, or diarrhea.  (Tr. 239)  She was in no acute distress at that time, and Dr. Min's report states that she had recovered from her gastric surgery and complications thereof.  (Id.)  He also noted her abdomen was soft and nontender.  (Id.)

On July 8, 2008, plaintiff was evaluated by William W. Wang, M.D., for admission to the psychiatric ward at St. Joseph's. (Tr. 232.)  Dr. Wang interviewed plaintiff's boyfriend, Robert, who stated she was not drinking as much as she used to.  (Id.)  At the time of examination, plaintiff was confused, but tried to deny significant alcohol use. (Id.) Dr. Wang diagnosed plaintiff with "[d]elirium, likely postictal, and alcohol dependence."  The seizures may have been associated with plaintiff's "being long-term anorexic and malnourished."

On July 9, 2008, plaintiff was discharged from St. Joseph Health Center (Tr. 238) and admitted to the St. Joseph's psychiatric facility (Tr. 231).

On July 10, 2008, Attila L. Varga, M.D., noted plaintiff was smoking a pack a day.  (Tr. 234.)  She had controlled hypertension, and a soft abdomen with a healed wound.  (Id.)  Dr. Varga noted alcoholic hepatitis. (Id.) On July 11, 2008, plaintiff was discharged from the psychiatric ward.  On August 10, 2008, plaintiff went to St. Joseph's for "convulsions" (Tr. 179) and was transferred to St. Joseph's Health Center – Wentzville on August 13, 2008.  (Tr. 184.)

On August 13, 2008, plaintiff saw Howard Goldstein, M.D., when she was admitted to St. Joseph's Health Center – Wentzville for rehabilitation.  (Tr. 148.)  Dr. Goldstein noted that plaintiff continued

to smoke and drink. (Id.) She did not have any abdominal pain, nausea, or vomiting, nor any problems chewing or swallowing. (Id.) Dr. Goldstein advised her to stop smoking. (Tr. 149

On August 14, 2008, Dr. Bergmann completed a Physician's Assessment for Social Security Disability Claim. (Tr. 218.) For "Current Diagnosis," he listed chronic abdominal pain and open abdominal wound. (Id.) As a summary of plaintiff's symptoms, recommended treatments, and prescribed medications, he listed severe weight loss, depression, and open wound. (Id.) He did not give a summary of pertinent clinical or laboratory findings. (Id.) When asked whether plaintiff's condition affects her ability to work, and if so, how long could she work in an 8-hour work day, Dr. Bergmann replied that the condition affects her ability to work, and that her ability to walk is severely limited. Dr. Bergmann also stated that he did not think plaintiff was capable of sedentary work, and was severely physically disabled. (Id.)

On August 22, 2008, plaintiff's daughter drove her to St. Elizabeth's for a twenty-one day inpatient alcohol detoxification program. (Tr. 241.) On August 26, 2008, Anna Nash, M.D., assessed plaintiff. (Tr. 241-42.) Dr. Nash noted that plaintiff's records showed she had been released from St. Joseph's Hospital on August 21, 2008, where she had been admitted for alcohol detox, but plaintiff did not take her medication after discharge. (Id.) Plaintiff's daughter said she had a seizure on the way to St. Elizabeth's. (Id.) However, plaintiff said to Dr. Nash that she had only had one seizure ever. (Id.)

On August 24, 2008, the St. Elizabeth's chart states plaintiff was "addicted to nose sprays" and that they would give her Flonase instead. (Tr. 212.) Plaintiff had no other complaints at that time. (Id.) On August 25, 2008, plaintiff reported to Anna Voeller, M.D., some anxiety and poor sleep, but that her appetite was "great." (Id.) She and Dr. Voeller discussed placing her on Paxil for depression. (Id.) On August 26, 2008, plaintiff stated her last drink was four weeks prior, and that she had been to two other facilities before arriving at St. Elizabeth's. (Tr. 209.) On August 27, 2008, plaintiff stated she would be homeless upon discharge because her boyfriend had kicked her out. (Tr. 208.) She had no physical complaints on that date. (Tr. 207.) On August 28, 2008,

plaintiff requested to be taken off an appetite inducing drug as she had gained ten pounds in two months; she was "obsessing about food all the time." (Tr. 205.)

On September 11, 2008, plaintiff was discharged from St. Elizabeth's. (Tr. 194.) In her discharge summary, Dr. Voeller said plaintiff had started drinking at 17; considered herself an alcoholic; had attended AA meetings twice per week; had been sober only for a three to four month period; admitted cravings, seizures, and anxiety; and has shakes, restlessness, and vomiting during withdrawal. (Tr. 189.) She also stated plaintiff had a safe detox. (Id.) Plaintiff's CAT scan and EEG were both normal. (Id.)

On September 29, 2008, Dr. Bergmann noted that plaintiff had gained weight recently. There is no indication of pain medications prescribed. On October 2, 2008, Dr. Bergmann wrote to plaintiff's attorney that she continued to have "significant" abdominal pain, but that her wound healed, she was eating better, and she had gained weight. (Tr. 186.)

On October 16, 2008, plaintiff saw Dr. Jasper. (Tr. 173-75.) The chronic problems he addressed that day were benign hypertension (stable), episodic alcohol abuse (stable), seizure disorder from alcohol abuse (asymptomatic), and COPD (stable). (Tr. 173.) She continued to smoke approximately one pack per day. (Id.) Plaintiff denied abdominal pain and weight loss at that time. (Id.)

On December 18, 2008, plaintiff called Dr. Bergmann's office, stating her wound was reopening and that there was a bulge next to the scar. (Tr. 147.) On December 22, 2008, Dr. Bergmann noted a small open area that was probably a stitch abscess, and did not prescribe any medication. (Id.)

On June 5, 2009, Dr. Bergmann indicates that plaintiff was still having chronic pain, and that she had a large hernia that would require surgery. (Tr. 146.)

Also on June 5, 2009, Dr. Bergmann completed a Supplemental Assessment for Social Security Disability Claim. (Tr. 145.) He listed a "large ventral hernia" as the current diagnosis. (Id.) He listed abdominal pain and swelling, difficulty eating, and an inability to bend or lift as her symptoms, recommended treatment and prescribed

medications. (Id.) He stated he still believed she was unable to perform sedentary work due to abdominal pain and swelling and a history of alcohol abuse. (Id.) He stated that, independent of any alcohol use, he still thought she could not work because of pain - a condition that would take major surgery to repair. (Id.)

On September 7, 2009, Dr. Bergmann noted that plaintiff had a ventral hernia and open wound. (Tr. 672.) On September 17, 2009, plaintiff was scheduled for surgery on October 14, 2009. (Id.) On October 14, 2009, Dr. Bergmann operated to repair the hernia and the wound. (Tr. 674.) The pre- and post-operative diagnosis was of ventral hernia with chronic ulcer of the wound. (Id.) Plaintiff was stable and in good condition at the end of the procedure. (Tr. 675.) On October 23, 2009, on a follow-up visit to Dr. Bergmann's office, plaintiff was still experiencing some pain; Dr. Bergmann prescribed Percocet. (Tr. 673.) On October 23, 2009, plaintiff was still complaining of some pain, but was feeling better. (Id.) Dr. Bergmann again prescribed Percocet. (Id.)

**Plaintiff's Testimony at the Hearing**

On June 19, 2009, plaintiff testified before the ALJ. Plaintiff testified that she had been cleaning houses prior to her July 2007 surgery. (Tr. 686.) Before that, she had stopped working to care for her late husband, who was ill at that time. (Tr. 686.) Previously, she had worked as a receptionist and bookkeeper for various businesses. (Tr. 116-23.)

Plaintiff has stomach pain that has prevented her from working since her surgery in July 2007, as well as pain from a hernia that she needed surgery to repair. (Tr. 686.) She had a significant problem with alcohol abuse. (Tr. 686-87.) Plaintiff went through inpatient detoxification at St. Elizabeth's in August and September 2008, and has not had any alcohol since. (Tr. 687.) Plaintiff explained that there were no indications of pain, loss of appetite, or pain medications in the St. Elizabeth's records because the facility was very leery of giving patients medication. (Tr. 688.)

The pain affects plaintiff's eating such that she can only eat small amounts, five or six times a day. (Tr. 688-89.) She ate similarly when she had the problems with the ulcer, and the doctors told her to eat more protein to help her wound heal. (Tr. 689.) The hernia was a result of the surgery and the subsequent wound care. (Tr. 689.)

Plaintiff still smokes, but less than she used to. (Tr. 689.) She smokes approximately a pack of cigarettes each week. (Tr. 690.) She receives $600 per month from her late husband's pension that allows her to buy cigarettes. (Id.)

Plaintiff spends a lot of time at the library, reading. (Tr. 690.) She meets with her sponsors - her "girls" - once each week for lunch. (Tr. 690.) She has not had any seizures since she stopped drinking. (Tr. 690.) She takes one Mirtazapine, a sleeping pill, before bed. (Tr. 691-92.) Plaintiff says her sleep is just okay, and has worsened some since leaving St. Elizabeth's. (Id.) She has to prop herself up at night, and wakes up frequently. (Tr. 697.) She has trouble getting comfortable. (Tr. 698.) This "possibl[y]" affects her alertness during the day. (Tr. 698.) She falls asleep four to five times a day as a result. (Tr. 698.) Her appetite is "so-so." (Tr. 692.) She tires easily, but does not have problems bathing or dressing herself. (Tr. 692.)

On a good day, she can shower, but still cannot lift anything. (Tr. 692.) On a bad day, she has a hard time getting around and walking. (Tr. 693.) She can only walk about half a block before having to stop and rest, and she has problems getting in and out of her car. (Tr. 693.) She says she can stand in one spot for a few minutes, but then she gets nauseous; she is unsure why. (Tr. 693.) She feels better sitting than standing, but it hurts if her stomach is "flared up." (Tr. 694.) She has to get up and move around every few minutes. (Tr. 694.) She sleeps sitting up because of her stomach. (Tr. 694.) She is not supposed to lift over five pounds due to the hernia; she has no problems with her arms or hands. (Tr. 694.) She tries to pick up the house where she is staying and prepare meals for her daughter or father. (Tr. 695.)

Plaintiff had problems with her original wound healing, and testified that it occasionally opens up near her hernia. (Tr. 696.)

When it is open, she has to change the dressings. (Tr. 696-97.) She has the pain all the time, but has somewhat gotten used to it. (Tr. 697.) She does not want to live on pain pills all the time. (Tr. 697.)

At the time of the hearing, plaintiff was scheduled to see Dr. Bergmann in approximately one month. (Tr. 698.) She thought Dr. Bergmann would want to schedule the hernia repair surgery after that visit. (Id.) Dr. Bergmann waited so long to do the surgery because he felt plaintiff was not psychologically ready for the operation since her first had been difficult for her. (Tr. 699.) Plaintiff still has difficulty bending, stooping, and climbing stairs. (Id.)

**Vocational Expert's Testimony at the Hearing**

The vocational expert, James E. Israel, L.P.C., C.V.E., C.R.C., also testified at the June 19, 2010 hearing. (Tr. 42, 699.) After reviewing plaintiff's work history, Mr. Israel found that her recent housecleaning work would be considered unskilled, light to medium work. (Tr. 699.) He found that plaintiff "has a skilled background in a variety of clerical areas providing customer support, bookkeeping, collections, a knowledge of insurance, processing claims, processing information, data entry and some certain amount of scheduling appointments, receptionist." (Id.) The DOT usually classifies these jobs as sedentary, but the way in which plaintiff performed them could move them into the "light work" category. (Id.) Despite the time lapse since performing those jobs, plaintiff's clerical skills would be moderately transferrable. (Id.)

The ALJ asked Mr. Israel if someone of the plaintiff's age, education, and work experience would be able to perform plaintiff's past work if she were limited to light exertion work where she could occasionally climb stairs and ramps, stoop, and crouch; never climb ropes, ladders, or scaffolds; push and pull frequently but not constantly; and not interact with pulmonary irritants, unprotected heights, and hazardous machinery. (Tr. 700-01.) Someone with those restrictions would be able to perform all of plaintiff's past clerical work as she had performed it. (Tr. 701.)

If the hypothetical person could only push or pull occasionally, but otherwise had the same restrictions as in the first hypothetical, that

person could perform plaintiff's past clerical work as it is generally performed in the economy (rather than how the plaintiff had performed it). (Id.)

Someone limited to sedentary activity, rather than light exertion, but who otherwise had the same limitations as in the second hypothetical could perform plaintiff's past work as a receptionist. (Tr. 701-02.) The hypothetical person could not perform plaintiff's other past jobs if limited to sedentary activity. (Tr. 702.)

If the hypothetical person were required additionally to she unscheduled breaks in the day and week for treatment or to lie down, they would not be able to perform any of plaintiff's past work. (Id.) Work that allows for these types of breaks and that is limited per the ALJ's restrictions does not exist in the national economy. (Id.)

### III.  DECISION OF THE ALJ

The ALJ found that plaintiff met the insured status requirements through June 30, 2010, such that she was eligible for benefits. (Tr. 12.) Plaintiff had not engaged in substantial gainful activity since the alleged onset date of disability. (Tr. 12.) He also found that plaintiff has severe impairments of status post-surgical repair of perforated ulcer, hernia, chronic obstructive pulmonary disease, and alcohol abuse, but that these impairments did not meet or medically equal any of the listed impairments in 20 C.F.R. Part 404, Subpart P, Appendix 1. (Tr. 12.) Additionally, the ALJ found that plaintiff had the residual functional capacity within twelve months of the onset date of disability to perform her former skilled sedentary work as a receptionist. (Tr. 12.)

### IV.  GENERAL LEGAL PRINCIPLES

The court's role on judicial review of the Commissioner's decision is to determine whether the Commissioner's findings comply with the relevant legal requirements and are supported by substantial evidence in the record as a whole. Pate-Fires v. Astrue, 564 F.3d 935, 942 (8th Cir. 2009). "Substantial evidence is less than a preponderance, but is enough that a reasonable mind would find it adequate to support the

Commissioner's conclusion." Id. In determining whether the evidence is substantial, the court considers evidence that both supports and detracts from the Commissioner's decision. Id. As long as substantial evidence supports the decision, the court may not reverse it merely because substantial evidence exists in the record that would support a contrary outcome or because the court would have decided the case differently. See Krogmeier v. Barnhart, 294 F.3d 1019, 1022 (8th Cir. 2002).

To be entitled to disability benefits, a claimant must prove she is unable to perform any substantial gainful activity due to a medically determinable physical or mental impairment that would either result in death or which has lasted or could be expected to last for at least twelve continuous months. 42 U.S.C. §§ 423(a)(1)(D), (d)(1)(A), 1382c(a)(3)(A); Pate-Fires, 564 F.3d at 942. A five-step regulatory framework is used to determine whether an individual qualifies for disability. 20 C.F.R. §§ 404.1520(a)(4), 416.920(a)(4); see also Bowen v. Yuckert, 482 U.S. 137, 140-42 (1987) (describing the five-step process); Pate-Fires, 564 F.3d at 942.

Steps One through Three require the claimant to prove (1) she is not currently engaged in substantial gainful activity, (2) she suffers from a severe impairment, and (3) her disability meets or equals a listed impairment. Pate-Fires, 564 F.3d at 942. If the claimant does not suffer from a listed impairment or its equivalent, the Commissioner's analysis proceeds to Steps Four and Five. Id. Step Four requires the Commissioner to consider whether the claimant retains the RFC to perform past relevant work. Id. The claimant bears the burden of demonstrating he is no longer able to return to his past relevant work. Id. If the Commissioner determines the claimant cannot return to past relevant work, the burden shifts to the Commissioner at Step Five to show the claimant retains the RFC to perform other work. Id.

In this case, the Commissioner determined that plaintiff had severe impairments, but those impairments combined did not meet or medically equal one of the impairments listed in 20 CFR §§ 416.920(d), 416.925, or 416.926. (Tr. 12.) The ALJ found that within twelve months of the alleged onset date of disability, plaintiff could perform her past work as a receptionist. (Tr. 12 - 13.)

**V. DISCUSSION**

Plaintiff argues that the ALJ's decision is not supported by substantial evidence. Specifically, plaintiff argues that the ALJ erred by failing to (1) properly consider Dr. Bergmann's opinion evidence; (2) fully develop the record; and (3) consider her non-exertional limitations.

**A. Dr. Bergmann's August 14, 2008, and June 5, 2009 Opinions**

Plaintiff argues that the ALJ improperly discounted Dr. Bergmann's August 14, 2008 and June 5, 2009 opinions. The ALJ found that Dr. Bergmann's August 14, 2008 opinion only "suggested" that plaintiff was disabled, and was otherwise unsupported by Dr. Bergmann's office records and Dr. Nissing's April 14, 2008 examination records. (Tr. 15.) The ALJ discounted Dr. Bergmann's June 5, 2009 assessment because Dr. Bergmann only "suggested" that plaintiff's condition precluded her from engaging in sustained full-time employment, and because no other treating physician had found or imposed any long-term limitations on plaintiff's functional capacity. (Tr. 17.)

"A social security hearing is a non-adversarial proceeding, and the ALJ has a duty to fully develop the record." Smith v. Barnhart, 435 F.3d 926, 930 (8th Cir. 2006). That duty includes a duty to contact a treating physician for clarification of an opinion, but "only if the available evidence does not provide an adequate basis for determining the merits of the disability claim." Sultan v. Barnhart, 368 F.3d 857, 863 (8th Cir. 2004). Put another way, the ALJ's duty to contact a treating physician for clarification is triggered when "a crucial issue is undeveloped." Ellis v. Barnhart, 392 F.3d 988, 994 (8th Cir. 2005). See also 20 C.F.R. § 404.1512(e). For example, if the treating physician's report "contains a conflict or ambiguity that must be resolved, the report does not contain all the necessary information, or does not appear to be based on medically acceptable clinical and laboratory diagnostic techniques," then the ALJ must contact the treating physician for clarification. 20 C.F.R. § 404.1512(e)(1). See also Goff v. Barnhart, 421 F.3d 785, 791 (8th Cir. 2005). However, the ALJ need not contact a

treating physician whose opinion is "inherently contradictory or unreliable." Hacker v. Barnhart, 459 F.3d 934, 938 (8th Cir. 2006).

Dr. Bergmann was plaintiff's treating physician, and personally performed plaintiff's emergency exploratory laparotomy. (Tr. 663-63.) On August 14, 2008, Dr. Bergmann filled out a form entitled "Physician's Assessment for Social Security Disability Claim." (Tr. 218.) The final question on the form sought Dr. Bergmann's "professional opinion as to whether [plaintiff's] condition would reasonably prevent her from engaging in sustained full-time employment (8 hours a day/5 days a week) at the sedentary level." (Id.) The question then stated, "Briefly explain your answer." (Id.) Dr. Bergmann responded, "I do not think she is able to work — severely physically disabled." (Id.) Dr. Bergmann's answer almost completely filled the area provided for his answer. (Id.)

On June 5, 2009, Dr. Bergmann filled out another form entitled "Physician's Supplemental Assessment for Social Security Disability Claim." (Tr. 145.) The form asked Dr. Bergmann if he still believed plaintiff was unable to work, and to "[b]riefly explain [his] answer." (Id.) In the small area provided on the form for his answer, Dr. Bergmann responded, "Yes, abd. pain and swelling and history of alcohol abuse." (Id.) The final question of the form asked Dr. Bergmann to "please state [his] opinion as to whether [plaintiff's] condition prevents her from working independent of any alcohol use." (Id.) Dr. Bergmann responded, "Yes because of pain — will need major surgery for repair." (Id.) Dr. Bergmann's answer filled almost the entire area provided by the form for his answer.

"[I]f the evidence does not support a treating source's opinion on any issue reserved to the Commissioner and the adjudicator cannot ascertain the basis of the opinion from the case record, the adjudicator must . . . recontact the source for clarification of the reasons for the opinion." SSR 96-5p, 1996 WL 374183, at *5. See also Tracy v. Astrue, 518 F. Supp. 2d 1291, 1301 (D. Kan. 2007). Because the ALJ found that Dr. Bergmann's opinion was unsupported by the evidence and because the form only sought a brief answer, the ALJ should have contacted Dr. Bergmann for additional explanation and medical reasons for his opinions. Tracy, 518 F. Supp. 2d at 1301 (ALJ erred in failing to contact treating

physician, after finding the physician's opinion was unsupported by specific findings, for additional information regarding the claimant's limitations).

Further, "[i]f the physician's reports of the claimant's limitations are stated only generally, the ALJ should ask the physician to clarify and explain." Higgins v. Apfel, 136 F. Supp. 2d 971, 978 (E.D. Mo. 2001). Because Dr. Bergmann only generally stated that plaintiff is disabled, given the instructions and space provided in the forms, the ALJ should have asked Dr. Bergmann to explain his opinions in medical terms. Id. at 978.

In addition, given Dr. Bergmann's history as plaintiff's treating physician and the brief answers sought by the forms and given by Dr. Bergmann, the ALJ had a duty to contact Dr. Bergmann for information supporting his opinions. See Bowman v. Barnhart, 310 F.3d 1080, 1085 (8th Cir. 2002) (ALJ had duty to contact treating physician of 30 years for additional information regarding the physician's cursory treatment notes); Weiter v. Astrue, 4:09 CV 702 FRB, 2010 WL 2802147, at *23-24 (E.D. Mo. July 15, 2010) (ALJ had duty to contact treating physician, who treated the claimant for 10 years and prescribed medication, about questionnaire); Petty v. Astrue, 550 F. Supp. 2d 1089, 1098 (D. Ariz. 2008) (ALJ erred in failing to contact physician whose narrative conflicted with his medical source statement).

Therefore, because the ALJ should have contacted Dr. Bergmann to obtain additional information regarding his August 14, 2008 and June 5, 2009 opinions, the ALJ's decision should be reversed and remanded.

**B. Duty to Develop the Record**

Plaintiff also argues that by failing to contact Dr. Bergmann, the ALJ did not fully and fairly develop the record. (Doc. 13.) For the reasons discussed above, the undersigned agrees. The ALJ should have contacted Dr. Bergmann for additional information regarding his opinions.

**C. Non-Exertional Limitations**

Plaintiff argues that the ALJ would have found him disabled, if he had considered records documenting her hernia surgery, which occurred

after the administrative hearing and thus were considered only by the Appeals Council (Tr. 672-75), along with Dr. Bergmann's opinions that plaintiff suffers from pain, requires major surgery, and has limited endurance (Tr. 145, 218), based on the testimony of the VE. (Doc. 13.)

In addition, the ALJ stated that "[o]n October 2, 2008, Dr. Bergmann noted the claimant had a hernia which may need repair. As of the hearing date, no surgery has been scheduled." (Tr. 17.) However, at the administrative hearing, plaintiff stated that she was going to see Dr. Bergmann in a month to schedule the surgery (Tr. 698), and the new records indicate that plaintiff had the surgery (Tr. 673-75).

Evidence submitted to the Appeals Council that is new and material "becomes part of the 'administrative record,' even though the evidence was not originally included in the ALJ's record." Cunningham v. Apfel, 222 F.3d 496, 500 (8th Cir. 2000). Because remand to contact Dr. Bergmann for additional information is appropriate, the ALJ should, on remand, consider the new evidence. See, e.g., Ackerman v. Astrue, No. C08-1020, 2009 WL 1492067, at *17-18 (N.D. Iowa May 21, 2009).

## VI. RECOMMENDATION

For the reasons set forth above, it is the recommendation of the undersigned that the decision of the Commissioner of Social Security be reversed and remanded under Sentence 4 of 42 U.S.C. § 405(g) for further evaluation. On remand, the ALJ must (1) contact Dr. Bergmann for additional medical information regarding his August 14, 2008 and June 5, 2009 opinions, and (2) consider the new evidence that arose after the administrative hearing and which was submitted directly to the Appeals Council.

The parties are advised that they have fourteen days to file written objections to this Report and Recommendation. The failure to file timely written objections may waive the right to appeal issues of fact.

                                          /S/   David D. Noce
                                       **UNITED STATES MAGISTRATE JUDGE**

Signed on February 4, 2011.